UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------- X

JUANITA ALSTON,

                              Plaintiff,    **FIRST AMENDED
COMPLAINT**

             -against-

                                         13-cv-1184-JG-RER

THE CITY OF NEW YORK; P.O. LYHEEM OLIVER,
TAX # 947311; P.O. JASON SMITH, TAX #
947476; and P.O. PHIL GLENN, TAX #           ECF Case
947757; the individual defendant(s) sued
individually and in their official           Jury Trial Demanded
capacities,

                            Defendants.

---------------------------------------- X

### PRELIMINARY STATEMENT

      1.    This is a civil rights action in which plaintiff seeks relief for the violation of plaintiff's rights secured by 42 U.S.C. § 1983; and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  Plaintiff's claims arise from incidents that arose on or about February 4, 2012.  During the incidents, the City of New York, and members of the New York City Police Department ("NYPD") subjected plaintiff to, among other things: unlawful search and seizure; false arrest; unreasonable force; failure to intervene; and implementation and continuation of an unlawful municipal policy, practice, and custom.  Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of costs and attorney's

fees, pursuant 42 U.S.C. § 1988, and such other and further relief as the Court deems just and proper.

## JURISDICTION & VENUE

2.      This action is brought pursuant to 42 U.S.C. § 1983, and the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is conferred upon this Court by the aforesaid statutes and 28 U.S.C. §§ 1331 and 1343.

4.      Venue is proper here pursuant to 28 U.S.C. § 1391 because some of the acts in question occurred in Kings County, and the City of New York is subject to personal jurisdiction in the Eastern District of New York.

## PARTIES

5.      Plaintiff Juanita Alston is a resident of the State of New York, Kings County, and African American.

6.      At all times alleged herein, defendant City of New York was a municipal corporation organized under the laws of the State of New York, which violated plaintiff's rights as described herein.

7.      At all times alleged herein, defendants P.O. Lyheem Oliver, Tax # 947311, P.O. Jason Smith, Tax # 947476, and P.O. Phil Glenn, Tax # 947757 were New York City Police Officers employed with the 73rd Precinct, located in Kings County, New

2

York or other as yet unknown NYPD assignment, who violated plaintiff's rights as described herein.

8.   The individual defendants are sued in their individual and official capacities.

### STATEMENT OF FACTS

**The Incident**

9.   On February 4, 2012, in the vicinity of 1933 Union Street, Brooklyn, New York, and the 73rd Precinct, Brooklyn, New York, several police officers operating from the 73rd Precinct, including upon information and belief, defendants P.O. Oliver, P.O. Smith, and P.O. Glenn, at times acting in concert, and at times acting independently, committed the following illegal acts against plaintiff.

10.   On February 4, 2012, at approximately 7:00 p.m., in the vicinity of 1933 Union Street, Brooklyn, New York, P.O. Oliver, P.O. Smith, and P.O. Glenn, without either consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff (or any third person) had committed a crime unlawfully arrested plaintiff.

11.   Juanita was in her apartment at 1933 Union Street, Brooklyn, New York, with her minor son, sister and her minor nephew.

12.    Juanita was watching television when the phone rang.

13.    Juanita answered the phone.

14.    Juanita was asked over the phone that either she or her sister come downstairs to verify her sister's boyfriend's identity with the police.

15.    Juanita's sister's boyfriend was downstairs outside the building being detained by the police.

16.    Juanita went downstairs.

17.    Juanita's sister's boyfriend's car was parked on the street.

18.    Juanita's sister's boyfriend was with his car.

19.    A police car was in the street facing in the wrong direction.

20.    As soon as Juanita left the building, P.O. Oliver, P.O. Smith, and P.O. Glenn demanded that she come to them.

21.    Juanita walked over to the police.

22.    The police asked Juanita to tell them her sister's boyfriend's name and date of birth.

23.    Juanita told the police his name, but she did not know his date of birth.

4

24.   Juanita's boyfriend's sister suddenly ran from the police.

25.   P.O. Oliver grabbed Juanita, while the other two officers ran after her sister's boyfriend.

26.   Juanita did not take any action to aide her sister's boyfriend in running from the police.

27.   Juanita did not distract, interfere or in way impede the police when her sister's boyfriend ran from the police.

28.   Juanita told P.O. Oliver to let go of her, but he did not.

29.   Instead, P.O. Oliver falsely accused Juanita of "planning" her sister's boyfriend's escape.

30.   P.O. Oliver twisted Juanita's arms behind her back and placed excessively tight handcuffs on her wrists.

31.   The police left Juanita in handcuffs outside her home.

32.   P.O. Smith and P.O. Glenn returned without Juanita's sister's boyfriend.

33.   The police then placed Juanita inside a police van.

34.   The police talked about having "collars" for each other.

35.   P.O. Oliver said that Juanita was "going down."

36.   P.O. Oliver also kept trying to unlock Juanita's phone.

37.   Juanita told the police she did not know anything about what was going on between the police and her sister's boyfriend.

38.   The police took Juanita to the 73rd Precinct.

39.   Juanita asked the police why she was being arrested, and they lied and said that she had "blocked" them.

40.   Juanita explained to the police that she had worked for the NYPD as a provisional P.A.A. at the 69th Precinct and knew what they were doing was illegal.

41.   The police used this against her by falsely claiming that Juanita tried to pretend she was a police employee.

42.   The police placed Juanita in a cell where there was a woman who said she was HIV positive.  The woman was menstruating, but the police would not provide her with a feminine napkin.  The cell's toilet had the woman's blood in and on it, so Juanita did not feel safe using the toilet.

43.   Juanita was eventually taken from the cell and the 73rd Precinct to Brooklyn Central Booking where she was

detained until February 6, 2012, when she was released on her own recognizance after arraignment.

44.   In order to cover up their illegal actions, the defendant officers, pursuant to a conspiracy, initiated, and falsely and maliciously told the Kings County District Attorney's Office that plaintiff had committed various crimes, including criminal impersonification and obstruction of governmental administration.

45.   The defendant officers made these false allegations, despite the fact that they had no evidence that plaintiff had committed a crime, to cover up their misconduct, to retaliate against plaintiff, to meet productivity goals and quotas, and to justify overtime expenditures.

46.   The charges against Juanita were adjourned in contemplation of dismissal on or about May 10, 2012, and the case was dismissed, terminating in her favor.

**General Allegations**

47.   The individual defendants acted in concert committing the above-described illegal acts toward plaintiff.

48.   Plaintiff did not violate any law, regulation, or administrative code; commit any criminal act; or act in a suspicious or unlawful manner prior to or during the above incidents.

7

58.    At no time prior to, during or after the above incidents were the individual defendants provided with information, or in receipt of a credible or an objectively reasonable complaint from a third person, that plaintiff had violated any law, regulation, or administrative code; committed any criminal act; or acted in a suspicious or unlawful manner prior to or during the above incidents.

59.    The defendants acted under pretense and color of state law and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority or law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of their rights.

60.    As a direct and proximate result of defendants' actions, plaintiff experienced personal and physical injuries, pain and suffering, fear, an invasion of privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation, and financial loss.

61.    Plaintiff is entitled to receive punitive damages from the individual defendants because the individual defendants' actions were motivated by extreme recklessness and indifference to plaintiff's rights.

8

## FIRST CLAIM

### (UNLAWFUL SEARCH AND SEIZURE UNDER FEDERAL LAW)

62.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

63.  Defendants unlawfully stopped and/or searched plaintiff without cause, a warrant, or consent.

63.  Accordingly, defendants are liable to plaintiff for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## SECOND CLAIM

### (FALSE ARREST UNDER FEDERAL LAW)

64.  Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein

65.  Defendants falsely arrested plaintiff without consent, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff had committed a crime.

66.  Accordingly, defendants are liable to plaintiff for false arrest under 42 U.S.C. § 1983; and the Fourth Amendment to the United States Constitution.

9

## THIRD CLAIM

### (UNREASONABLE FORCE)

67.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

68.   The individual defendants' use of force upon plaintiffs was objectively unreasonable.

69.   The individual defendant officers did not have an objective and/or reasonable basis to use any degree of force against plaintiff, since plaintiff was unarmed, compliant, and did not resist arrest.

70.   Those defendants who did not touch plaintiff, witnessed these acts, but failed to intervene and protect plaintiff from this conduct.

71.   Accordingly, the defendants are liable to plaintiff for using unreasonable and excessive force, pursuant to 42 U.S.C. § 1983; and the Fourth Amendment to the United States Constitution.

## FOURTH CLAIM

### (FAILURE TO INTERVENE)

72.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

73.    Defendants had a reasonable opportunity to prevent the violations of plaintiff's constitutional rights, but they failed to intervene.

74.    Accordingly, the defendants are liable to plaintiff for failing to intervene to prevent the violation of plaintiff's constitutional rights.

## FIFTH CLAIM

### (MONELL CLAIM)

75.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

76.    Defendant City of New York, through a policy, practice and custom, directly caused the constitutional violations suffered by plaintiff.

77.    Defendant City of New York through the NYPD and its officers, committed the following unconstitutional practices, customs and policies against plaintiff: (1) wrongfully arresting innocent persons; (2) using unreasonable force on individuals; (3) fabricating evidence against innocent persons; and (4) retaliating against people who complain about police misconduct.

78.    Upon information and belief, defendant City of New York, at all relevant times, was aware that the defendants were unfit officers who have previously committed the acts

alleged herein, have a propensity for unconstitutional conduct, or have been inadequately trained.

79.   Nevertheless, defendant City of New York exercised deliberate indifference by failing to take remedial action.  The City failed to properly train, retrain, supervise, discipline, and monitor the individual defendants and improperly retained and utilized them.  Moreover, upon information and belief, defendant City of New York failed to adequately investigate prior complaints filed against the individual defendants.

80.   Further, defendants City of New York was aware prior to the incident that the individual defendants (in continuation of its illegal custom, practice and/or policy) would stop, arrest and prosecute innocent individuals, based on pretexts and false evidence.

81.   The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct involving the individual defendants, placing the defendant City of New York on notice of the individual defendants' propensity to violate the rights of individuals.

82.   In addition to frequently violating the civil rights of countless residents of New York City, numerous members

12

of the NYPD commit crimes. Officers have been arrested and
convicted of such crimes as planting evidence on suspects,
falsifying police reports, perjury, corruption, theft, selling
narcotics, smuggling firearms, robbery, fixing tickets, driving
under the influence of alcohol, vehicular homicide, assault and
domestic violence. In fact, former NYPD Commissioner Bernard
Kerik was convicted of corruption-related crimes in federal and
state court and served time in federal prison. In 2011, Brooklyn
South narcotics officer Jerry Bowens was convicted of murder and
attempted murder in Supreme Court, Kings County, while under
indictment for corruption and is presently serving a life
sentence. In 2011, Police Officer William Eiseman and her
subordinate Police Officer Michael Carsey were convicted of
felonies in Supreme Court, New York County, for lying under
oath, filing false information to obtain search warrants and
performing illegal searches of vehicles and apartments. In 2012,
New York City Police Officer Michael Pena was convicted in
Supreme Court, New York County, of raping and sexually
assaulting a woman at gunpoint and is presently serving a
sentence of 75 years to life.

    83.   Additionally, the existence of the aforesaid
unconstitutional customs and polices of profiling minorities,
may be inferred from an analysis of the NYPD conducted by the

New York Civil Liberties Union ("NYCLU").  The NYCLU's analysis revealed that more than 2 million innocent New Yorkers were subjected to police stops and street interrogations from 2004 through 2011, and that black and Latino communities continue to be the overwhelming target of these tactics.  Nearly nine out of 10 stopped-and-frisked New Yorkers have been completely innocent, according to the NYPD's own reports.

        84.   In August 2009, Proffer Levine released a report entitled *The Epidemic of Pot Arrests in New York City*, which stated: Perhaps most appalling is who the police are arresting for marijuana possession.  United States government studies have consistently found that young whites use marijuana at higher rates than do young blacks or Latinos. But the NYPD has long arrested young blacks and Latinos for pot possession at much higher rates than whites. In 2008, blacks were about 26% of New York City's population, but over 54% of the people arrested for pot possession. Latinos were about 27% of New Yorkers, but 33% of the pot arrestees. Whites were over 35% of the City's population, but less than 10% of the people arrested for possessing marijuana. In 2008, police arrested Latinos for pot possession at four times the rate of whites, and blacks at seven times the rate of whites.

85.   Furthermore, documented civilian complaints about officer misconduct show that African Americans are the most likely targets of abuse, but their complaints are largely ignored.  According to the City of New York's Civil Complaint Review Board's ("CCRB") Status Report, dated December and January 2010, in 2010 African Americans were overrepresented as alleged victims of police misconduct.  Although making up only 23% of New York City's population, they are 58.5% of the alleged victims in CCRB complaints.  On the other hand, whites and Asians were a disproportionately low percentage of alleged victims.

86.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by plaintiff as alleged herein.

87.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the NYPD were the moving force behind the constitutional violations suffered by plaintiff as alleged herein.

88.   The City's failure to act resulted in the violation of plaintiff's constitutional rights as described herein.

15

       **WHEREFORE**, plaintiff demands a jury trial and the following relief jointly and severally against the defendants:

      a.   Compensatory damages in an amount to be determined by a jury;

      b.   Punitive damages in an amount to be determined by a jury;

      c.   Costs, interest and attorney's fees, pursuant to 42 U.S.C. § 1988; and

      d.   Such other and further relief as this Court may deem just and proper, including injunctive and declaratory relief.

DATED:     Brooklyn, New York
            August 28, 2013

                         MICHAEL O. HUESTON, ESQ.
                         *Attorney for Plaintiff*
                         16 Court Street, Suite 3301
                         Brooklyn, New York 11241
                         (718) 246-2900
                         mhueston@nyc.rr.com
                         By:

                         _____s/_____
                         MICHAEL O. HUESTON